# AFFIDAVIT OF SPECIAL AGENT KEITH T. BROWN

I, Keith T. Brown, being duly sworn depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since July 2014. I am presently assigned to a squad that investigates economic crimes, including wire fraud.

2. I make this affidavit in support of a criminal complaint charging MARK ANDERSON JONES with wire fraud in violation of 18 U.S.C. § 1343.

3. In particular, I have probable cause to believe that JONES engaged in a Ponzi scheme in which he paid investment returns, or repaid investment principal, to investors from new capital provided by other investors, rather than from profits earned by his purported business.

4. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit sets forth only those facts that establish that there is probable cause for the issuance of a criminal complaint as to the named individual and does not set forth all of my knowledge of this matter.

## BACKGROUND

5. MARK ANDERSON JONES ("JONES"), 64, is a United States citizen who formerly resided in Massachusetts and currently resides Jamaica.

6. From at least 2007 through 2015, JONES obtained approximately $10 million in investments from more than 20 individuals for the purported purpose of providing bridge financing to Jamaican businesses. Jamaican banks can take time to close loans to businesses, and JONES claimed that he was offering these businesses bridge loans as an interim measure (i.e., to "bridge" the gap between the date a loan was sought from Jamaican banks and the distribution of funds by those banks).

7. In reliance on JONES' representations that their money was being used to fund bridge loans, JONES' investors, including investors in Massachusetts, provided financing, and expected a return on their investments, based on the anticipated interest that the businesses were to pay pursuant to the terms of the bridge loans.

8. JONES provided investors with promissory notes and periodic account statements, which memorialized and detailed the investments, earnings, and distributions.

9. In reality, however, beginning in at least November 2014, JONES stopped using investor money to fund bridge loans. Instead, he used new investor money to pay back other investors.

**THE SCHEME TO DEFRAUD**

10. As set forth below, beginning in at least November 2014 and continuing through at least July 2015, JONES engaged in a scheme to defraud in which he obtained money from individuals for investments based on false representations regarding how the invested money would be used, and he misappropriated the funds for other uses.

## Investor-1

11.     For example, one investor ("Investor-1") initially provided JONES money in or about November 2009 for the purpose of investing in bridge loans. JONES sent Investor-1 an e-mail describing the bridge loan investment opportunity. Subsequently, JONES sent Investor-1 periodic account statements for "The Bridge Fund," which detailed her investment balance.

12.     In or about November 2014, Investor-1 provided an additional $300,000 to JONES for the purpose of investing in bridge loans. Bank records reflect that JONES deposited the $300,000 by check into his Wells Fargo account on or about November 17, 2014. In the memo line of the check, Investor-1 wrote for "Bridge Fund."

13.     After JONES deposited Investor-1's $300,000, the account balance in his Wells Fargo account was approximately $301,993.[1]

14.     Thereafter, and instead of investing Investor-1's funds into bridge loans, JONES used Investor-1's money to pay other bridge loan investors. Specifically, bank records show that on or about November 28, 2014, JONES transferred approximately $145,390 to other bridge loan investors. Then, on or about December 1 and December 3, 2014, JONES transferred approximately $130,000 to one bridge loan investor and approximately $21,000 to another bridge loan investor. All of these transfers were made by interstate wire.

15.     Account statements prepared by JONES and correspondence with recipients of the wire transfers show that JONES represented the payments set forth in paragraph 14 above as "interest" or repayment of their invested principal.

---

[1] Bank records further show that between approximately November 21, 2014 and November 28, 2014, JONES deposited an additional approximately $45,000 and withdrew approximately $5,000. After these transfers, the balance of JONES' Wells Fargo account on or about November 28, 2014 was approximately $340,000, approximately $300,000 of which was provided by Investor-1.

16. For example, on or about November 28, 2014, JONES sent an e-mail to one of the bridge loan investors to whom he transferred a portion of Investor-1's funds stating: "I just did your interest payment today, and will make the principal payment on Monday. I have updated your account statement for same, which is attached."

17. Similarly, on or about December 1, 2014, JONES sent an e-mail to another bridge loan investor to whom he transferred a portion Investor-1's funds stating: "I have wired $21,000 to you--this brings your regular investment account up to date--statement [for 'The Bridge Fund'] attached."

### Investor-2

18. Thereafter, on or about January 6, 2015, JONES sent an e-mail to another investor ("Investor-2") attaching a December 2014 "account statement" for The Bridge Fund. According to that account statement, Investor-2's investment was approximately $4.2 million. The December 2014 account statement also reflected that Investor-2 withdrew $100,000 in October 2014.

19. In the same January 6, 2015 email, JONES solicited Investor-2 for another investment. Specifically, JONES wrote: "[y]ou had mentioned you might re-invest the $100k you took out at end of year [sic]. I do have a home for it if this is still your thought."

20. The next day, Investor-2 responded by e-mail and advised that he could invest "anywhere from 100K to 200K," but that it would take a couple of weeks to arrange his funds.

21. On or about January 15, 2015, JONES sent Investor-2 another e-mail about the prospective new investment. Specifically, JONES attached a "promissory note" and a "personal guaranty" concerning the new money that Investor-2 intended to transfer to JONES. In that e-mail, JONES also attached an "Investment Agreement" and "Attachment A," both of which referred to a "portfolio of bridge loans" as of January 2015. The Investment Agreement provided by JONES stated that, among other things, Investor-2 "has given authorization to JONES to invest [Investor-2's] funds in the portfolio, and to administer [Investor-2's] investment in the portfolio." Attachment A was a schedule identified as the "January 2015 Portfolio," which summarized the loans in which Investor-2 was purportedly invested at that time.

22. Bank records show that, on or about January 22, 2015, Investor-2 deposited $200,000 via interstate wire transfer into JONES' Wells Fargo account.

23. With the addition of Investor-2's investment, on or about January 22, 2015, the balance in JONES' Wells Fargo account was approximately $208,310.

24. Notwithstanding JONES' representations to Investor-2 regarding use of the re-invested funds, bank records show that JONES used approximately $180,000 to pay four other bridge loan investors. Of that $180,000, JONES transferred approximately $147,394 of Investor-2's money to "Investor-3."

25. Correspondence from JONES to Investor-3 shows that JONES represented the payments set forth in paragraph 24 above as "interest" and repayment of her invested principal.

26.     For example, on or about January 14, 2015, JONES sent an e-mail to Investor-3, which stated: "Attached are the year-end statements for your loans. I am going to make payments on or around Tuesday/Wednesday next week---$20,625 interest for the main loan account, and then $126,769.27 for the loan you are withdrawing [total of $147,394.27]." Approximately ten days later, JONES sent Investor-3 another e-mail: "sending wire tomorrow morning." JONES' e-mail correspondence with Investor-3 is a reference to the approximately $147,394 he paid to Investor-3 from Investor-2's funds.

### Lulling Efforts

27.     Between approximately November 2014 and July 2015, JONES also continued to lull other bridge loan investors into believing that they would receive payments.

28.     For example, on or about November 29, 2014, JONES sent a series of e-mails to an investor in Massachusetts ("Investor-4"). Specifically, in response to Investor-4's request to redeem his investments, JONES sent an e-mail in which JONES attached an account statement purportedly reflecting the status of Investor-4's investment. JONES also wrote "[n]o problem with redemption—is typically 90 days, but in view of amount and your needs, can probably organize in 60." It is my understanding that Investor-4 is still seeking a return on his investment from JONES.

29.     In or about June and July 2015, another investor ("Investor-5") sent a series of e-mails to JONES seeking interest payments.  On or about June 30, 2015, Investor-5 sent an e-mail to JONES asking for confirmation that he would receive interest payments of approximately $15,000 each month through September 2015.  Investor-5 also asked for a list of outstanding bridge loans.  Investor-5 further wrote: "hate to ask but I have about $1,300,000 with you, most of my life savings, and I want reassurance."  JONES did not respond until on or about July 2, 2015, when he sent an e-mail to Investor-5 stating: "[s]orry for delay in response---I understand your requirements and will respond accordingly. As we spoke I am finalizing a bank funding transaction in the next week which will be well in advance of your end of month funding requirement.  Paperwork to follow."

30.     However, on or about the day before JONES responded to Investor-5, bank records show that JONES transferred $50,000 from his Wells Fargo account to a law firm (the "Law Firm").  The Law Firm's publicly available website advises that the firm specializing in criminal defense work.

31.     Investor-5 did not subsequently receive interest payments.

## Conclusion

32.     Based on my knowledge, training and experience and the facts set forth in this affidavit, I have probable cause to believe and that, from at least November 2014 and continuing through at least July 2015, JONES committed wire fraud, in violation of 18 U.S.C. § 1343.

Sworn under the pains and penalties of perjury.

_____
Keith T. Brown
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
On March 11, 2016

_____
DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE

